The next matter, number 23-1227, Jeffrey A. Neese v. City of Chicopee. At this time, would Counsel to the Appellant please introduce herself on the record? Good morning, Your Honors. Emily Smith Lee representing the Plaintiff Appellant, Jeffrey Neese. And if I may, I'd like to reserve two minutes for rebuttal. Thank you. This is a case that arises from a claim of retaliatory discharge involving Mr. Neese, my client's role in an underlying discrimination case. I will say as much or as little about the underlying merits of that case as you would like me to. I would suggest for purposes of this, what's before the Court today, what's relevant about that case is Mr. Neese's role, how the City felt about his role, and whether that had anything to do with his termination. At issue here is the recording and the transcript of a City Council meeting that took place a little less than two months before Mr. Neese was fired. That City Council meeting had been an issue in the case from the beginning. Before the suit was filed, a day before Mr. Neese was terminated, a City Council member told him, City Council had talked about his role in the Huber case, and the Mayor was, quote, not happy. Counsel, I understand your opposing counsel's argument here to be that that evidence that you would have been able to get in from the questions you wanted to ask about the meeting was really cumulative, and you're responding it's not cumulative because it's the best evidence of the points that you wanted to make. So what I want to ask you to focus on is what in particular from the transcript of that meeting do you think was the best evidence that you were prohibited from entering into the record, very specifically? Yes, absolutely, Your Honor. Skip ahead to that part right there. What the jury was allowed to hear was a very bland version that the City was aware of his evidence submitted in that case and that it was not favorable to the City. Not exactly a neon sign. What transpired at the meeting were a number of things that we think are really significant here. One is counsel for the City described to the City Council things like we would have expected Mr. Neese to be our best witness, but he was a nightmare witness for the City, and referencing him numerous times in the explanation as to why the City had to settle the case. That's thing number one. That puts a whole lot more color on the situation. And remember, we're trying to prove motive here, and motive feels a lot differently if you know a bland fact than if you get this sense of literally outrage at Mr. Neese that we would argue comes out of these transcripts. Secondly, there was discussion in that meeting by various City Council members who, in varying degrees of explicitness, suggested that something should happen to Mr. Neese. And then counsel for the City, one of whom is the City solicitor, who also advises the Mayor about employment issues, contract renewals, non-renewals, etc. Their answer was not no. Their answer was not yet. We're still in this litigation. We can't do anything for fear of allegations of retribution. So counsel, let me just back up then. So do you think that if you'd simply been able to get into the record that your client was described as a nightmare witness, that that would have been enough to change the verdict here? Let me put aside your second point. Is that what you're arguing? I think that neither this Court nor I could say with fair assurance that it would not have. There's a, you know, as is often the case in a retaliation or discrimination case or any case where a motive for termination is at issue, the employer can parade in a whole bunch of witnesses to say bad things about the plaintiff. And to some extent, yes, there is a piling up. You know, there's a measurement here that the jury has to make. And to be deprived of such a direct piece of evidence to help them weigh that, do I have a crystal ball? No. But I can tell you the jury deliberated for two days. They did not immediately come back and say, yes, City of Chicopee, you're right. They struggled with this question. And it was the only question on which they found against Mr. Neese. They found that he had engaged in protective activity. All the rest is in the papers. So putting all that together, yes, I do. I do believe that that would have had an impact in addition to the second point, which I understand you were not asking me about. Turning to your second point, I think one of the arguments made on the other side is that your characterization of the record is not accurate. Not surprising that the two parties disagree on that. And that it would have taken a lot of work to establish what exactly was being asked about the further action that was required. So, again, your opposing counsel argues really what they were talking about was that the process, the hiring process that was at issue was problematic from start to finish. There needed to be additional training on how to conduct interviewing and hiring processes. And your interpretation of what was said isn't correct. And, you know, again, from a trial judge's point of view, trying to make decisions in the moment on what makes sense to spend a lot of time on and what doesn't, what's cumulative, what isn't, why was that an abuse of discretion here? For a couple of reasons, Your Honor. Number one, there were a number of people making comments about Mr. Neese. And some of them, I would agree, were talking about the hiring process. Others, Mr. McAuliffe in particular, who said, you know, can we do something and call it John Doe to protect the guilty so that we don't have to say Mr. Neese. Others were, I think, if you look at the transcript, a little more focused on Mr. Neese. For example, one of the council members saying, you know, we're supposed to have our department heads stand together on these things. What's he doing breaking rank? By way of example. But turning to the abuse of discretion point, because it's obviously a deferential standard. Yeah, fair enough. Given the different views and that it wasn't the mayor saying it, it was other people saying it. And you can establish that the mayor definitively heard what was said. Again, why is it an abuse of discretion that we should overrule when we're not the ones sitting in the trial hearing all the evidence? Two reasons. I think I would suggest the first reason is globally around this transcript, the judge took an overly narrow view of what's required to be relevant. Specifically that he seemed to be requiring an explicit connection to the mayor in the face of the fact that we had a presentation that was directed by the mayor. By the people who gave presumably the same information to him to recommend settlement. And were asked by the city council members to bring these concerns back to the mayor. Both Attorney Moriarty and Attorney Albano said, yeah, it was our practice to brief the mayor after meetings like this. I don't remember doing it. He must have done it. Given all of that, we should have been allowed to argue the inferences to the jury about the connection to the mayor. The city of Chicopee would presumably argue the lack of inference. But the point to the abuse of discretion is this should have been up to the jury instead of the judge making his own judgment about the nature of the inferences and how credible he found them. Could you have asked the mayor some of these questions when he was on the witness stand? Just one second. Specifically why he thought the settlement was unpalatable? I'll be honest. I don't remember if I asked that question. I don't think you did. We could have and did ask the mayor questions about the settlement. We could have and did ask the mayor questions about what he was told coming out of this meeting in an effort to connect those dots for the trial judge. That second set of questions were foreclosed by the evidentiary rulings. We were not allowed to ask him what was brought back to him from the city council meeting. I would also just say practically speaking, the answer to your question in addition to me not being perfect, is this came up very late in the game. These tapes surfaced. The city claimed they had never been made because of malfunctioning equipment. They surfaced literally on the eve of the first trial date. After we had already deposed Mayor Koss, all the other city witnesses, the trial judge did appropriately give us a little time to do some additional discovery. There's only so much you can cram into four weeks with an entirely new piece of information and seven or eight entirely new witnesses. We couldn't go back and redo the discovery of Mayor Koss, which functionally, as I'm sure you know, limits how far you can and should go. Couldn't you have asked to redepose him once this evidence surfaced? Possibly. Again, practically speaking, we could have done under limited time. In a way, we've got a problem of the city's making for which we were carrying the burden here to try to play catch up after two years of discovery when a thing that we'd been asking about for years was suddenly found because somebody decided to go look for it. I see my yellow lights on. Can I ask you a question about the privilege issue? Yes. Why does the privilege waiver for the city council meeting apply to conversations with the mayor that are completely separate from the immediate events of the city council meeting? Why is the waiver, in your view, that broad? Two things. One, the city council and the mayor are not separate entities as it relates to the privilege. The testimony of their attorneys was clear at trial. It is the city writ large that is the client of these attorneys. So there's not really this distinction that council is trying to argue between the mayor and the city council. because of the open meeting law. So why does that waiver apply to private conversations between council and the mayor? So they did not waive it only because of the open meeting law. They explicitly waived the attorney-client privilege over those conversations. This is the subject matter waiver argument. That where we have a conversation directed by the mayor through council to the city council on the subject matter of the Huber lawsuit, that that is within the subject matter of what we were asking to explore with respect to council's communications with the mayor. The sort of fairness principle of this is it's an unorthodox version of the sword and the shield. You know, council has argued we're not relying on advice of council. And yet, they're keeping out the transcript on the basis that we cannot connect the mayor to the transcript. The mayor only connects to city council through his attorneys. Having sort of asserted that to block this evidence from coming in, our view is under the subject matter waiver portion of the federal rules that the waiver should have been extended to include the conversations with the mayor, at least insofar as necessary to make that connection. Judge Lopez, do you have any questions? Yes, thank you. Council, I understand that the critical issue in this case was the motivation of the mayor in terminating your client. Now, I understand that that's an insight into that motivation. What happened at that council meeting is not relevant unless the mayor knows about what was going on at that council meeting, whether it was communicated to him in some way. I gather from your statements here that the mayor was on the stand. With him on the stand, you were trying to establish what he knew about that meeting. And your attempt to do that was concluded by the judge, apparently on relevance grounds. Is that correct? Is that what happened? Largely. Some of the sidebars were a little muddy, Your Honor, as to whether it was relevance or privilege. There were some questions, I believe, that were specifically precluded on privilege grounds. We'll look at the record, but what questions, if you can recall, were precluded on the basis of relevance? I believe, and I'm going to defer to the stack of papers in front of me that's the briefing words, I believe there was specifically a question precluded on privilege grounds around what was reported to him from that city council meeting. I don't want to misrepresent anything to the court, so I rely on my papers for that, but that is my memory. So just to be clear, so in these conferences, there were some rulings to preclude the questioning on grounds of privilege, and some on the basis of relevance? Both grounds were invoked by the court? I believe that's correct, Your Honor. What I'm unable to do for you right this minute is to tell you exactly which question and exactly which sidebar, but I believe we laid that out in the brief and that those interactions are in the addendum to the brief. All right. Thank you. Thank you very much. Thank you, counsel. At this time, if counsel for the appellee would please introduce themselves on the record to begin. Good morning. May it please the court, Meredith Fierro on behalf of the appellee, City of Chicopee. Your Honors, this is the case where, in the words of the district court, the plaintiff just simply failed to connect the dots, failed to show that anything the district court excluded would have changed the jury's mind in regards to whether there was a causal connection between the non-renewal of Nisa's contract and Nisa's deposition testimony. Instead, what the evidence at trial showed was that the plaintiff was an unqualified employee who was hired by the mayor's predecessor, who was often a no-show at work, ignored emails, antagonized other employees and volunteers for the city, caused union grievances to be filed, and created safety issues. Starting with the executive session evidence, since that was a large discussion with the opposing counsel, the district court did not abuse his discretion in excluding the statements that were made at that executive session as irrelevant, because the mayor was the one who decided not to renew Nisa's contract, and the mayor didn't know what was said at the meeting. The evidence was that the mayor wasn't present at the meeting. The mayor was specifically asked by opposing counsel, by plaintiff's counsel, about whether he was aware of concerns that were raised by council members at the meeting, and he answered no. Where is that in the record? Yes, that's on page 1371 of the record app. And all the witnesses who testified at trial, the city solicitor Moriarty, the assistant city solicitor Albano, both testified that they didn't tell the mayor about what happened at the meeting. The two city counselors that Nisa called, Counselor McAuliffe, testified that he didn't tell the mayor about what happened at the meeting. He was the one who made the comment about whether Nisa was going to be disciplined for telling someone something that wasn't true, which was referring, of course, to his conduct in the employment process, not his deposition testimony. And he testified that he never spoke to the mayor about that, and that there were no conversations between him and the mayor whatsoever about what happened at the executive session. And then the other city counselor who testified at trial was Counselor LaFlem, who also testified after much questioning by plaintiff's counsel. It was eventually realized that he also did not communicate with the mayor about what happened at the meeting. So there's no evidence whatsoever in the record that the mayor knew of anything that was said at that meeting. And even if the transcript of the meeting had been admitted into evidence, it wouldn't have changed the jury's mind. Of course, how could the jury think that this would have affected Mayor Costa's decision making when he didn't even know about it? But setting that aside, the substance of the statements that plaintiff sought to admit, again, was that one statement that she isolates from Counselor McAuliffe about whether Nisa would be disciplined for telling someone something that wasn't true. He made similar statements about Amy Berube-Rivera and Al Reisnick. Again, this was all about their conduct in the employment process, not about the deposition testimony. And again, if you look at the record as a whole, the general tenor of these statements, and this was a very long discussion, was is there going to be an investigation? McAuliffe testified at trial that he really didn't have an opinion on whether or not Nisa should be disciplined. He was asking the question because he wanted there to be an investigation, and then just to follow the facts where they led. And then the other statements, the substance of the statements that plaintiff's counsel sought to admit, had to do with the assistant city solicitor's assessment of the Huber litigation. But this was cumulative because Mayor Koss was on the stand and was allowed to testify about his views of the case and why he decided to settle. He testified that he was regularly updated about the Huber litigation, that he knew that Nisa testified, that he knew that Nisa's testimony was unfavorable to the city, that he knew that there was a significant risk that the city could lose its case, and that he ultimately decided to settle because of the potential cost of attorney's fees. In that instance, the settlement was $140,000. Attorney's fees could easily be over that. So it's not as if the jury wasn't allowed to hear about the Huber case while Mayor Koss was on the stand. And then turning to the communications, the confidential communications between assistant solicitor Albano and Mayor Koss. Again, the district court did not abuse his discretion in excluding this as protected by attorney-client privilege. This was a one-on-one conversation. To put this in time, this happened before the executive session. There's not an exact date on it in the trial, but we know it happened after the mediation of the case, which occurred on April 3rd and before the executive session on April 24th. So are you saying there's no conversation after the meeting that Mr. Nisa was trying to get into the record? That is correct, Your Honor. It was only before the meeting, and it was about Attorney Albano's assessment of the case and his recommendation that the mayor settle the case. And again, while the district court precluded evidence about exactly what Attorney Albano said to Mayor Koss, he did allow a lot of questioning. He gave the plaintiff's counsel a lot of leeway and allowed her to ask a lot of questions of Mayor Koss about why he decided in his mind to settle, and he testified to that. And it's clearly protected by attorney-client privilege, one-on-one communication between the two of them, rendering legal advice. Why wasn't it encompassed by the subject matter waiver, as your opposing counsel argues? Right. So the waiver that occurred happened at the depositions before trial. It was at the deposition of Counselor McAuliffe and then the deposition of Attorney Albano. And it was clearly limited to what occurred at the – I'm sorry, it was Moriarty, not Assistant Albano. But it was clearly limited to what happened at the executive session. The waiver did not encompass anything outside of that. And subject matter waiver would not apply in this circumstance because under Rule 402, as well as this – the entire idea of subject matter waiver is premised on the idea of fairness, of you can't affirmatively put into evidence to gain a litigation advantage, something that would otherwise be protected by attorney-client privilege, and then at the same time withhold other things protected to further your case. This isn't what happened. The waiver occurred after – and this is in the record – plaintiff's counsel threatened to file a motion to compel if these individuals were not allowed to testify about what happened at the executive session, citing the SJC's decision on the open meeting law, and convinced trial counsel that there was no good faith basis to object. So that's entirely – so subject matter waiver really would not apply in that instance. And again, even if Albano had been allowed to testify as to what he told – as what he told Mayor Koss about his recommendation for settling the case, it wouldn't have changed the jury's mind. The question that plaintiff's counsel was not allowed to ask or asked, and then the objection was sustained, was whether Attorney Albano advised the mayor that Nisa's testimony was harmful to the city. But again, Mayor Koss already testified that he knew that Nisa's testimony was unfavorable. I mean, those – unfavorable, harmful – those are synonyms. It wouldn't have changed the jury's mind. And even if somehow there was an abuse of discretion in these exclusionary rulings, it would have been harmless. Nisa had an extremely weak retaliation case. He had no direct or indirect evidence that the mayor was upset at Nisa for his deposition testimony beyond Nisa's own testimony that – which, of course, the jury didn't have to credit – that the mayor's attitude towards him changed around the spring of 2018. Of course, the spring of 2018, that was when Nisa's contract was coming up for renewal. Remember, plaintiff's counsel said that he was terminated. He wasn't terminated. His contract wasn't renewed. That was at the end of June. That was around the same time that all of this was happening. And it was also at the same time where there was an issue where Nisa had sent an aggressive email to volunteer members of the Parks and Recreations Commission that upset that volunteer member who talked to Mayor Koss, and Mayor Koss was very happy about that. And there also – there was no evidence whatsoever that Mayor Koss's dissatisfaction with Nisa's work performance was a pretext to cover up this retaliation or discriminatory motive. The witnesses testified at trial that the mayor was unhappy with Nisa. Since the fall of 2015, Nisa's own witness, City Councilor McAuliffe, testified that Mayor Koss's issues with Nisa occurred before the Huber litigation and Stan Kulig, who was the former superintendent, who was one of the people asked to mentor Nisa, also testified that the mayor was beginning to have concerns with Nisa in the fall of 2015, well before this occurred. Nisa's deposition testimony was in 2017. But all of the evidence that plaintiff contends, the missing link evidence, was in spring of 2018. And also in the 2015, that's substantiated by the fact that the mayor, Mayor Koss, asked two individuals to mentor Nisa to improve his performance in the fall of 2015. In addition, numerous witnesses testified at trial that they complained to Nisa about the mayor. So it's not as if the mayor was simply inventing issues after the fact. The HR director testified that she had serious concerns about Nisa that she reported to the mayor. Batista testified that she complained to the mayor that Nisa didn't give direction to department heads. It was always on his phone. Kulig testified that he reported back to the mayor. Nisa didn't put in enough time. Counsel? Let me just ask you, because we know you put in a lot of evidence into the record to support your client's case here. But I think what opposing counsel is arguing is, as she said, there's sort of bland evidence, which is her characterization of the way that the mayor talked about his knowledge of the unfavorable testability by Mr. Nisa. And then there's a statement like, he's a nightmare witness for us. And I understand there is a lot of evidence in the record, but the jury is generally allowed to make inferences. I mean, pretext is always a question of inference. There's almost never direct evidence. And this was a piece of evidence that they argue would have been critical as indirect evidence, that perhaps the Huber testimony was a tipping point in deciding not to renew his contract. So can you address why is it harmless to sort of preclude counsel from making sort of the point in the most persuasive way to the jury that the city was looking at Mr. Nisa as a nightmare witness in this litigation that caused them to spend $140,000? Right. I mean, I think it's a stretch to say that nightmare versus unfavorable testimony really would have changed the jury's mind in the face of all this other evidence. But the district court judge did not preclude plaintiff's counsel from asking Mayor Koss if he viewed Nisa as a nightmare witness for the city, if he was upset with Nisa for his deposition testimony, asking other witnesses who knew the mayor if the mayor talked to them about Nisa and his deposition testimony, or if they saw the mayor's attitude towards Nisa change in response to that. You know, while the district court did preclude the attorney Albano from testifying about his advice to Nisa, describing him as a nightmare witness, again, she could have asked similar questions of Mayor Koss. Now, whether she would have gotten a favorable answer, probably not. But the fact that an attorney described a witness that way when he's trying to convince the city council to approve the financial order for the settlement, that that would have showed that all these other reasons were a pretext, I think this is really an instance where we have to defer to the district court who was able to view all the testimony before the jury. And again, quite simply, the city had overwhelming evidence that the mayor did not renew Nisa's contract because of Nisa's lack of work ethic, but all Nisa has put forth is speculation and extrapolation, and there's no basis to conclude that the excluded evidence would have substantially affected the jury's verdict. For that reason, and because the excluded evidence was irrelevant and or protected by attorney-client privilege, we respectfully ask that you affirm the district court. Judge Lopez, do you have any questions? I do. Thank you. Counsel, I'm looking at the transcript of this meeting with the city council that the city solicitor and other attorney had. I want to read to you from that transcript. Let me just say it's very clear from looking at this transcript that the city counselors are very angry about what's happened here, and they're very focused on Mr. Leafs for putting the city in the position they find themselves in. One counselor says, for me, during my career, and then to see how all this has been handled is ridiculous. Another, we're going to lose. I mean, I've never heard of anything like this in all the time I've been up here where one department head says something totally different. Another speaker, right. And then this speaker, this is what I think is particularly important. Then his subordinate. That is subordinate, which is right underneath him. I mean, it just doesn't make any sense, and I agree. I hope that you'll take the message back to the mayor that we need some in-service training so that they get on the same page when hiring people, that nobody should be undercutting the other guy because it just means we're going to lose if they go to court. There's no way you can win. Wouldn't you think, in light of this transcript, that counsel would want to ask the mayor, was that message delivered to you? There's a directive in here. Take this message. Take our anger about what happened here. We want to be sure the mayor understands this. Wouldn't it be appropriate for counsel to ask the mayor if he got that message, the very message that the counselor said should be delivered to him? Yes, Your Honor, of course, and Plaintiff's Counsel was not precluded from asking that question. She was only precluded from asking about what exactly was said at the executive session, not about the mayor's own knowledge and the page of the transcript that I read before. The question she asked was, prior to Niese's termination, were you aware of any questions or concerns that had been raised by the council members? Answer, no. And just also to address the pages of the transcript that you read, it is true that council members were upset about what had occurred, but the statements they made, at least as I read them, were not about Niese's deposition testimony. It was about the conduct during the hiring process, and when you have the department head saying, oh, a 100-pound lifting requirement, that's not required. We can waive that for you. That's not a problem. And then the head of the garage saying, oh, that is a legitimate requirement. The two of them not being on the same page as to what were the requirements for the job was what led to this lawsuit. So that's what they were upset about, the employment process, not about Niese's deposition testimony. All right. Thank you. Thank you, Your Honor. Thank you. Thank you, counsel. At this time, if counsel for the appellant would reintroduce herself on the record. She has a two-minute rebuttal. Hello again. Emily Smithley for the point of appellant. I'm going to start, Jedalefis, with your question first. I would have loved dearly to ask that question in the same powerful way that you just presented it using the transcript from the meeting. However, recall that we were under orders from the court not to use any of this information unless and until it was ruled admissible. That was an order we had to lift in order to even file this appeal. So I did not have the latitude to read from the transcript and ask Mayor Koss, were you given this message? That would have been a good thing. And to Mayor Koss, I think what counsel is suggesting is... Excuse me, counsel. Yes. Just so I understand. That was because there were unresolved privilege issues about your use of the transcript, and that's why the judge said you can't use any of this until I rule explicitly on how privilege might apply to a juice? If you're seeing a look on my face, it's not directed at you. It's because the way this played out was not typical. So it came up. There was a fight about whether we could have it before trial. We had the discovery battle. The judge allowed us to have it and introduce this protective order that was very, very broad. You know, at the time, we had to get that partially lifted so my client could even see the transcript. We did all of those things. We come to trial, and then there is a motion to preclude me from even mentioning the transcript in my opening, and the judge says, again, you know, nothing has changed unless and until there's admissibility ruling. I confess I did not try reading from the transcript in a cross-examination question, but I believed it would be contrary to the trial court's order. Does that help? So it's not clear to me, Your Honor, whether the reason for that protective order was strictly privilege in the first place, but that's kind of where we stood as the trial began. Does that answer your question, sir? Yes, thank you. Thank you. I can't see your face, so I don't want to move on without you. The other point I wanted to make, the argument seems to be, well, you had Mr. Koss on the stand. Mayor Koss was, though not personally a defendant, the key player in the defense seat, and to view the rules of evidence as precluding anything as irrelevant or cumulative because you could ask the guy you're suing his view on the matter, again, overly narrow definition of what the standard of relevance really is. And I would just say two quick things. Your time is up, so make it very quick. Okay, very quick. The retaliation claim was weak enough that it took the jury two days to come to a conclusion. Finally, trials are a truth-seeking exercise. This was a fairly large amount of truth that was kept from the jury. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.